# UNITED STATES NAVY-MARINE CORPS
# COURT OF CRIMINAL APPEALS
# WASHINGTON, D.C.

**Before**
**F.D. MITCHELL, J.A. FISCHER, M.C. HOLIFIELD**
**Appellate Military Judges**

**UNITED STATES OF AMERICA**

v.

**DUSTIN M. CLARK**
**AIRMAN (E-3), U.S. NAVY**

**NMCCA 201400232**
**GENERAL COURT-MARTIAL**

**Sentence Adjudged:** 21 February 2014.
**Military Judge:** CDR Robert P. Monahan, Jr., JAGC, USN.
**Convening Authority:** Commandant, Naval District Washington, Washington Navy Yard, Washington, DC.
**Staff Judge Advocate's Recommendation:** LCDR J.D. Pilling, JAG, USN.
**For Appellant:** David Sheldon, Esq.; Capt Michael Magee, USMC.
**For Appellee:** LT Jetti Gibson, JAGC, USN; Capt Matthew M. Harris, USMC.

**14 July 2015**

---------------------------------------------------
**OPINION OF THE COURT**
---------------------------------------------------

**THIS OPINION DOES NOT SERVE AS BINDING PRECEDENT, BUT MAY BE CITED AS PERSUASIVE AUTHORITY UNDER NMCCA RULE OF PRACTICE AND PROCEDURE 18.2.**

PER CURIAM:

A military judge sitting as a general court-martial convicted the appellant, contrary to his pleas, of one specification each of rape and forcible sodomy, in violation of Articles 120 and 125, Uniform Code of Military Justice, 10

U.S.C. §§ 920 and 925.[1]  The military judge sentenced the appellant to seven years' confinement, reduction to pay grade E-1, and a dishonorable discharge.  The convening authority approved the sentence as adjudged and, except for the punitive discharge, ordered it executed.

The appellant raises two assignments of error (AOE): (1) his convictions are legally and factually insufficient and (2) his trial defense counsel were ineffective in failing to compel discovery of the victim's mental health records.

After carefully considering the record of trial and the submissions of the parties, we find merit in the appellant's first AOE asserting that the evidence is factually insufficient to sustain his convictions.  We take action in our decretal paragraph.[2]  Arts. 59(a) and 66(c), UCMJ.

## Background

On the evening of Saturday 24 March 2012, Ms. SW accompanied her friend, Petty Officer AM, to a house party on the military installation where AM was stationed.  After consuming alcohol and socializing at the party, SW, AM, and several other party goers accompanied the appellant to his house, located on the same military installation, to continue socializing.

At trial, SW testified that throughout the evening she engaged in consensual amorous activity with three different men, including the appellant, before ultimately "blacking out" while at the appellant's house.  At the initial party, SW and AM went into a bedroom where, according to SW's testimony, she and AM laid together in bed for about fifteen minutes and kissed "probably briefly."[3]  This encounter ended when another party goer, Mr. WC, interrupted and asked them to rejoin the party downstairs.[4]  Shortly thereafter, SW and WC[5] went to an upstairs

---

[1] The military judge acquitted the appellant of one specification of aggravated sexual assault for engaging in a sexual act with a person who was substantially incapacitated.  The rape and aggravated sexual assault specifications were pled in the alternative.

[2] AOE 2 is rendered moot by our actions.

[3] Record at 224-25.

[4] *Id.* at 168.

bedroom where they consensually participated in sexual activity short of intercourse.[6] This encounter ended when WC retreated to a nearby bathroom to vomit due to his alcohol consumption. A witness testified to seeing WC come out of the bedroom and head to the bathroom and that WC was naked and wearing a condom.[7] AM testified that he saw SW in the bedroom after WC left for the bathroom and she was in her underwear and getting dressed.[8]

A group including SW, AM, and the appellant then left the party and went to the appellant's house. SW testified that while at the appellant's house, she and the appellant "made out" while sitting on the couch in the living area.[9] Other witnesses reported seeing SW and the appellant mutually kissing while seated on the couch.[10] SW testified that at the end of the evening she accepted the appellant's offer to spend the night at his home because she was too intoxicated to drive. SW testified that the next morning she awoke in an upstairs room, completely naked and on the floor, next to the appellant who was also naked.[11] SW testified that at this point her last clear memory was of going upstairs with the appellant.[12]

According to SW, she then left the appellant's house, retrieved her car from the site of the original party, and drove off the base. SW testified that she got lost while attempting to drive home, so she stopped and slept in her car for several more hours. After she awoke, SW went to a friend's house where she spent the remainder of her Sunday.[13]

SW testified that on Monday afternoon, after work, she noticed bruises on her thighs.[14] Still unable to recall events

---

[5] WC testified that he is six-foot four inches tall and weighs two hundred and thirty pounds. *Id.* at 507.

[6] *Id.* at 169, 229-34, 509-10.

[7] *Id.* at 401.

[8] *Id.* at 385.

[9] *Id.* at 178-79.

[10] *Id.* at 364, 386, 399-400.

[11] *Id.* at 188-89.

[12] *Id.* at 190.

[13] *Id.* at 190-94.

from Saturday night, SW took photos of the bruises and then went to a local hospital to have a sexual assault exam performed.[15] The exam results proved inconclusive as to whether SW had engaged in intercourse.[16] SW was at the hospital from Monday night until early Tuesday morning.

SW testified that on Tuesday she began to have recollections of what happened Saturday night. SW described having four segmented memories of what occurred with the appellant that night. In further clarifying her recollections SW testified, "[s]egmented, just like there's spaces of time in between them that I have absolutely no recollection of what happened. I don't remember the specific order of--of occurrences."[17] SW then testified to recalling the following "segmented" memories:

(1) She was clothed and lying on her back on the floor and appellant was on top of her and holding her arms down. She also testified to recalling feeling pressure on her legs, but she could not specifically recall how the appellant was positioned. She testified that she resisted and asked the appellant to stop, but she "gave up pretty quickly" because she was intoxicated and scared. She did not testify to what, if anything, the appellant was doing to her in addition to holding her in this position;[18]

(2) She was completely naked on her back and the appellant was on top of her and penetrating her vagina with his penis. She testified that she recalled it being painful. She could not recall whether the appellant was clothed or unclothed at this time. Additionally, she could not recall whether the appellant was restraining her arms and did not testify to the appellant restraining her in any fashion or to any communication between her and the appellant at this point;[19]

---

[14] *Id.* at 201.

[15] *Id.* at 209.

[16] *Id.* at 349.

[17] *Id.* at 183.

[18] *Id.* at 183-85.

4

(3)  She was on her back and the appellant turned her over by the hips from her back to her front.  SW did not testify as to her or the appellant's state of dress at this time, whether she resisted the appellant's actions or whether they engaged in any communication;[20]

(4)  She was lying on her back facing upward and the appellant used his hand to open her mouth and insert his penis.  She provided no information as to what, if anything, she did to resist the appellant's actions.  Nor did she testify to the amount of force the appellant used to open her mouth.  She could not testify to the appellant's physical position during this event, but recalls that she gagged when he inserted his penis in her mouth.[21]

SW also testified to a memory of the appellant sucking and biting her breasts,[22] however she did not clarify whether this was part of one of aforementioned segmented memories or separate.  She testified that none of this sexual activity with the appellant was consensual.[23]  She further testified that while "making out" with the appellant on the couch earlier that night, she told him she was not interested in having sex with him.[24]

Approximately three months later, SW reported that she had been raped to law enforcement personnel.  She testified that she did so following advice from her therapist that reporting the incident was a better course of action than her plan to confront the appellant directly.  SW testified, however, that her primary motive in going to law enforcement was to do all she could to protect others from the appellant.[25]

---

[19] *Id.* at 185–86.

[20] *Id.* at 186.

[21] *Id.* at 187–88.

[22] *Id.* at 187.

[23] *Id.* at 189.

[24] *Id.* at 179.

[25] *Id.* at 212–13.

The appellant provided two sworn statements to Naval Criminal Investigative Service (NCIS) investigating agents.[26] In his initial statement the appellant confirmed that he met SW when she and others came to his house on the night in question. However, the appellant denied that she spent the night at his house and further denied engaging in any sexual activity with her. In his second statement, given approximately five months later, the appellant stated that he blacked out that night and awoke the next morning alone on the floor of his room wearing only his boxers and with a condom lying next to him. He further stated that he thought, at that moment, that he'd had sex with SW because she was the only woman at his home the prior night. He indicated that he felt ashamed at that time because, although he and his wife had recently separated, he was still married.

*Expert Testimony*

Dr. Stafford Henry, M.D., was called as an expert witness[27] by the Government and provided the following testimony:

TC   Doctor, are you familiar with the phrase "alcohol-induced blackout"?
WIT  I am.

TC   Can you tell the military judge what is that.
WIT  Sure. An alcohol-induced blackout is a--it is a form of amnesia. Amnesia is basically a lack of memory. It is an antegrade amnesia. It is an amnesia which is causally linked to the self-administration of alcohol.

MJ   Doctor, what's the meaning of the term "antegrade"?
WIT  Judge, there are—there are two kinds of amnesia, retrograde and antegrade. Antegrade amnesia is an amnesia, for the purposes of this hearing, of what occurred during a period of intoxication. Retrograde amnesia would be biographical information such as where you went to school, what your mother's maiden name is. So antegrade means from—from—from—to one point forward. Retrograde means historical.

MJ   I understand. You may proceed.

---

[26] Prosecution Exhibits 1 & 2.

[27] Dr. Henry testified that he is board certified in general psychiatry, forensic psychiatry and addiction psychiatry and he was recognized by the court as an expert witness in those fields.

```
TC    Doctor, are there different types of blackout?
WIT   Yes, there are.

TC    And what are they?
WIT   There are two kinds of blackouts.  One is fragmentary,
      which is more common.  The second is en bloc …

TC    Can you describe the difference between a fragmentary
      and an en bloc.
WIT   Sure.  Essentially, Judge, en bloc blackout is a—it's
      an antegrade amnesia----

MJ    I'm sorry, we're speaking of en bloc right now or
      fragmentary?
WIT   En bloc.

MJ    Okay, I understand.  Please proceed.
WIT   An en bloc is an antegrade amnesia with generally a
      very discrete beginning and a very discrete end.  So
      there's a block of time for which that person cannot
      recall.  Alternatively, a fragmentary blackout is just
      that.  It is a recollection of events which occurred
      during the period of intoxication which is partial.

TC    Can alcohol cause fragmentary blackouts?
WIT   Yes, alcohol can cause fragmentary blackouts.

TC    Is there a set or required BAC or amount of alcohol
      one would have to consume in order to experience some
      type of blackout?
WIT   No.

TC    At what point would the—would an individual who
      experienced a blackout realize that they experienced a
      blackout?  More specifically, while a person is in a
      state that they later will not recall, does that
      individual know that they are in a blackout?
WIT   You only know you're in a blackout retrospectively.
      Only—it is only after the fact, after—after—at some
      point later that you realize you do not have a
      recollection for a past event.

TC    And then can a person walk and talk and then later not
      have memory of that walking and talking?
WIT   That is possible.
```

MJ   That's within the context of an alcohol-induced blackout?

WIT  Absolutely, sir.

MJ   You may continue.

TC   So is it possible that an individual could—could be somewhat functioning, moving, communicating, but then later have no recollection of that due to a fragmentary blackout?

WIT  Yes, that is possible.[28]

Dr. Henry further testified on direct examination that he thoroughly reviewed the investigations and medical information in this case and he extensively interviewed SW. Dr. Henry testified that, in his professional opinion, SW "provided a description which was very clinically consistent with a fragmentary blackout."[29]

During the defense case in chief, Dr. Thomas Grieger, M.D., was called as an expert in the fields of clinical and forensic psychiatry. Dr. Grieger testified extensively regarding the formation of memories and the potential effect of alcohol on memory retention. Dr. Grieger provided the following testimony:

DC   Okay. Can you describe the mechanism of a fragmentary blackout, what—what that means in terms of memory.

WIT  Yeah, what—what a fragmentary blackout is is that you are putting portions of an experience into short-term— into long-term memory as that event is occurring. It can also--it can often be the most salient aspects of something, the most significant aspects of something that's going on, the most emotional aspects of something that's going on, but you're not really putting into long-term memory all of the details that go between those salient events. So the next day you would recall the salient events and the emotion tied to those but would not recall the details of events that went on in between those events, and they could be in an incorrect temporal sequence. In other words, you might remember a conversation with Mr. Smith first and Mr. Jones second. In fact, that conversation could have occurred in reverse order. You may remember a conversation with a group of five people on

---

[28] *Id.* at 448-50.

[29] *Id.* at 451.

a particular topic.  You then have another conversation with seven other people on a different topic.  You might, when you recall this, incorrectly mix up who was involved in which of those conversations and incorrectly think that somebody from the second conversation actually was also in on the first conversation.  So you're capturing the most salient, most significant aspects and not capturing the things that go in between.

An en bloc blackout or period of amnesia, similarly, would be a consistent period of time.  You wouldn't be capturing those moments of salient information.  You would have a point at which your memory would gradually fade out and then you would have a period at which you can remember again.  Commonly with en bloc blackouts the memory ends sometime while you're still awake and active in what you're doing and doesn't come back until you've gone to sleep and wake up the next day.  It's less common that someone will have an en bloc blackout say from 2200 to 0200 and then all of a sudden remember everything clearly from 0200 through the rest of the night.  Typically the en bloc, the very solid blackouts, would last until you've gone to sleep and your alcohol level has come back down while you're sleeping.

DC   Okay.  Do you believe that—do you agree with Dr. Henry that a person only knows if they were in a blackout retrospectively, looking back?

WIT  Yes, you could end up in a different place, you could end up with a person you don't know and have no recollection of how that occurred.  So you might know on your own that you had a blackout or you might be involved in a conversation with someone who was at the same event that you were at at a later point in time and they might ask you about something you said or did.  You would simply not remember that you said or did it.  The important thing with blackouts is that they—once—you haven't put it into long-term memory, it's no longer retrievable.  It's not—it's not that— those neurologic changes which put it into long-term memory have not occurred.  So, if it's not present the next day, it won't somehow be formed later on because the short-term memory is lost.

MJ   Could you say that again for me, Doctor?

9

WIT   The--the process of remembering something is that it's transitioned from short-term memory to long-term memory.  If that process never occurs in reasonable proximity to when the events occurred, it never will occur, because the short-term memory will be gone.  There is no mechanism by which it can move into long-term memory after the fact.

MJ    So the transfer will not have occurred?  So there's no memory to remember?

WIT   Exactly.  You haven't saved the document in your word processor.  So, when you shut the computer off, it's gone.

DC    So, with regard to a fragmentary blackout, that meaning that some--some memories are retained and some memories are just never transmitted into long-term memory, for those memories that--that were formed, when will those be retrievable?

WIT   They would be retrievable at the end of that evening, for example and be retrievable the next day.  As with all memories, they would decay with time.  So, to the extent that they are retrievable, they would be most retrievable the next day, the next period of being awake and not intoxicated.

DC    So those fragments that a person is able to remember from a fragmentary blackout, is it your testimony that if those memories that were truly formed during-- during the blackout, that they would be retrievable the following--the following day?

WIT   Yes, they would.  You might not spontaneously recall all of the details.  Someone might prompt you and say, "Do you also remember that we talked about this?" With that prompting you say, "Okay, yes, I remember that conversation."  It wasn't as salient as the other pieces of the conversation.  So you didn't—you didn't just spontaneously come up with it, but with a little bit of prompting you can expand a bit.  There has to be the primary memory there to being with if you're going to anything more.  Then the prompting would have to be very specific to what the primary memory is to be able to capture it accurately.

DC    So, for a memory that was actually formed during a fragmentary blackout, if that was not retrieved on the first day or the second day but retrieved on the third

10

day, based on your understanding of how memory works, is that--is that scientifically possible to retrieve on a third day a memory that was actually formed during a fragmentary blackout?

WIT  It doesn't fit with any construct of the way memories actually work.

DC  And why is that, sir?

WIT  Because you have to go through that process while the information is fresh in your mind. It doesn't--it doesn't sit in a--you know, in a vacuum someplace that you can then reopen it later and push it into long-term memory. It's there while it's there. When the period of time has passed, it's no longer accessible.[30]

The Government recalled Dr. Henry in rebuttal and he provided the following testimony:

TC  Doctor, would you agree with Dr. Grieger's testimony that if you cannot—after—after a night of heavy drinking of alcohol, if one cannot recall a memory the following day, that they never will?

WIT  Well, I would respectfully disagree with Dr. Grieger on that point. I have never ever heard that. I've never read that. I think that that may be true of an en bloc blackout but certainly is not true of a fragmentary blackout. That is not true because I don't see it clinically and, secondly, the science is that, in fact, alcohol disrupts that transfer process. The transfer process is disorganized. It would then stand to reason that, given the disorganization of the transfer and encoding process, that later retrieving those memories will also be haphazard.

. . . .

TC  Doctor, to clarify, would you agree that in an en bloc blackout an individual never lays down long-term memories during that blackout?

WIT  In an en bloc, yes, I think I would agree with that statement more than I would disagree with it. What I would say is when an en bloc blackout occurs there has been a disruption in the transfer of memory from

---

[30] *Id.* at 541-45.

short-term to long-term.  It, in a sense, never got there.

TC    Would you agree that in a fragmentary blackout—could you describe in a fragmentary blackout, how that is different.

WIT   In a fragmentary blackout the transfer of information and the laying down of information occurs but in a disorganized and haphazard fashion.  That is very simple.  It--on a neurocellular level, it's far more complex, but for the purposes of this discussion, it was laid down and transferred in a disorganized fashion.  Because of that disorganization in how it was laid down, it then cannot oftentimes be retrieved in an organized fashion.  The manner in which a person retrieves fragmentary blackouts is random, just as [SW] described.  She described pieces.  She described scenes.  She specifically told me there was no order.

MJ    Doctor, state that again so I can follow you.

WIT   Sure.  In this case [SW] was sleep deprived.  For example, she said that Monday night she got to the hospital at around 10:30 and then didn't leave until 5:30 and then went to--directly to her employer's house.  She is sleep deprived.  Monday night she was able to get more sleep.  The way the body works is, if you are sleep deprived, it will take--it will use an opportunity to catch up on sleep.  It this case, it would make perfect sense that she was then able to retrieve her memories several days down the road when she caught up in her--in her sleep.  The memories that she retrieved were fragmented, were disorganized because that's how they were laid down.[31]

### Factual Sufficiency

We review issues of factual sufficiency *de novo*. *United States v. Beatty*, 64 M.J. 456, 459 (C.A.A.F. 2007).

The test for factual sufficiency is "whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, [we are] convinced of the [appellant]'s guilt beyond a reasonable doubt." *United States v. Turner*, 25 M.J. 324, 325 (C.M.A. 1987). In conducting this unique appellate role, we take "a fresh,

---

[31] *Id.* at 605-07.

impartial look at the evidence," applying "neither a presumption of innocence nor a presumption of guilt" to "make [our] own independent determination as to whether the evidence constitutes proof of each required element beyond a reasonable doubt." *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002). Our factual sufficiency determination is limited to a review of the "entire record," meaning evidence presented at trial. *United States v. Bethea*, 46 C.M.R. 223, 225 (C.M.A. 1973).

We have reviewed the record of trial and evaluated the arguments by the appellant and the Government. Additionally, we have made allowances for not having heard and observed the witnesses. Having done so, and having considered the unique facts of this case, we are not personally convinced of the appellant's guilt of rape or forcible sodomy.

The appellant was convicted of causing SW to engage in sexual intercourse "by using strength, sufficient that she could not avoid or escape the sexual contact" and committing sodomy with SW "by force and without [her] consent." The appellant was charged under the version of Article 120, UCMJ, in effect from 1 October 2007 to 27 June 2012, which made it an offense to cause another person to engage in a sexual act by using force against that other person. Art. 120(a), UCMJ (2007). In pertinent part, "force" was defined as, "action to compel submission of another or to overcome or prevent another's resistance by . . . strength, power, or restraint applied to another person, sufficient that the other person could not avoid or escape the sexual conduct." Art.120(t)(5), UCMJ (2007). Similarly, under Article 125, UCMJ, "force" is physical violence or power applied by the accused to the victim. An act of sodomy occurs "by force" when the accused uses physical violence or power to compel the victim to submit against his/her will. *See* Military Judges' Benchbook, Dept. of the Army Pamphlet 27-9 at ¶ 3-51-2 Note 4 (25 Jun 2014).

We are unconvinced by the record before us that the Government met their heavy burden of proving the required element of force for either offense. While SW's description of appellant holding her by her arms provided some evidence of force, she could not link this action by the appellant to any further act, sexual or otherwise, and the disorganized, potentially non-sequential order of her memories prevents us from concluding that the charged forcible sexual acts necessarily followed.

13

SW's segmented memories lacked significant details and she could provide no chronology of the events she did remember. The events of SW's segmented memories accounted for at most minutes or perhaps only seconds out of at least a seven-hour period and there is no further evidence in the record of what happened between the appellant and SW during the relevant time frame. As our sister court succinctly stated in a recent opinion, it is simply not our role to speculate as to what may have occurred between the appellant and SW or to fill in the gaps left by the Government's presentation of its case. *See United States v. Soto*, 2014 CCA LEXIS 681, unpublished op. (A.F.Ct.Crim.App. (16 Sep 2014) (*en banc*), *aff'd*, __ M.J. __, 2015 CAAF LEXIS 398 (C.A.A.F. 2015). The Government's case rested nearly exclusively on SW's delayed and partial memories that ultimately lack the detail and completeness necessary to prove the charges.

The lack of physical findings to support SW's description of events also gives rise to reasonable doubt. SW testified to memories of the appellant holding her down by the arms, using his hand to open her mouth, biting her breasts, and taking her by the hips and turning her over to her front from her back. The sexual assault exam performed within forty-eight hours of the incident documented no physical findings on SW's arms, breasts, face, mouth or hips. Nor was there DNA evidence introduced linking the appellant and SW in any fashion. The primary physical findings were bruises on SW's legs. Although SW was insistent that the bruises did not come from her interactions with AM and WC that night, she specifically testified that she could recall no actions by the appellant that caused the bruises. While we are not suggesting that physical findings are required to prove rape or forcible sodomy charges, in the case at bar, the lack of such evidence further amplifies deficiencies in the Government's case.

Finally, the conflicting expert testimony concerning the circumstances and validity of SW's delayed recollection of the events at issue contributes to our reasonable doubt in this case. Dr. Henry and Dr. Grieger are both qualified experts with extensive experience in clinical and forensic psychiatry. Their testimony was largely consistent with the notable exception of their differing opinions on the reliability of SW's delayed recollection of events. Dr. Grieger stated that SW's testimony regarding her recollections "doesn't fit with any construct of the way memories actually work" and to the extent SW had retrievable memories they would be most retrievable the next period of being awake and not intoxicated, which in this case was Sunday. Dr. Henry disagreed stating that "I have never ever

14

heard that.  I've never read that ... [t]hat is not true because I don't see it clinically and, secondly, the science is that, in fact, alcohol disrupts that transfer process."  We find nothing in the record to favor one expert's opinion over the other on this point, but we do note that Dr. Henry stressed the importance of sleep in the memory recovery process following an alcohol induced blackout.  We further note SW's testimony that she regained the bulk of her memories throughout the day on Tuesday, after she underwent the sexual assault exam at the hospital from Monday night until early Tuesday morning.  Although SW did not testify to how much, if any, sleep she got that night, based on the information before us it is reasonable to conclude that she did not experience a restful night of sleep prior to regaining her memories of the event in question.  Additionally, contrary to her in court testimony, SW told Dr. Henry that she regained her memories of the event over the course of a week which helped inform his opinion that SW provided him a description that was clinically consistent with experiencing a fragmentary blackout.

## Conclusion

Under the facts presented and for the reasons stated we simply are not convinced that the Government satisfied its burden of proving the appellant's guilt to the charges of rape and forcible sodomy beyond a reasonable doubt.  We therefore find the appellant's convictions factually insufficient.  The findings of guilty and the sentence are set aside.  The charges and specifications are dismissed with prejudice.

For the Court

R.H. TROIDL
Clerk of Court

15